UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NATIONAL PARKS CONSERVATION
ASSOCIATION and JOHN
ADORNATO, III,

       Plaintiffs,

v.                        Case No: 2:11-cv-578-FtM-29CM

UNITED STATES DEPARTMENT OF
INTERIOR, NATIONAL PARK
SERVICE, and UNITED STATES
FISH AND WILDLIFE SERVICE,

       Defendants.

SAFARI CLUB INTERNATIONAL,
FLORIDA WILDLIFE
FEDERATION, and FLORIDA
FISH AND WILDLIFE
CONSEVATION COMMISSION,

       Defendants –
       Interveanors.

_____

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL
RESPONSIBILITY, FLORIDA
BIODIVERSITY PROJECT,
SIERRA CLUB, SOUTH FLORIDA
WILDLANDS ASSOCIATION,
WILDERNESS WATCH, and BRIAN
SCHERF,

       Plaintiffs,

v.                        Case No: 2:11-cv-647-FtM-29CM

KENNETH SALAZAR, Secretary,
U.S. Department of the
Interior, JONATHAN B.
JARVIS, Director, National
Park Service, and DANIEL M.

ASHE, Director, U.S. Fish &
Wildlife Service,

        Defendants.

SAFARI CLUB INTERNATIONAL,
FLORIDA            WILDLIFE
FEDERATION,  and  FLORIDA
FISH     AND     WILDLIFE
CONSEVATION COMMISSION,

        Defendants –
        Interveanors.

---

## OPINION AND ORDER

This matter comes before the Court on five cross motions for summary judgment in these consolidated cases.   Then-magistrate judge Sheri Polster Chappell filed a seventy-nine page Report and Recommendation (Doc. #123)[1] on January 31, 2013, recommending that Plaintiffs' motions be denied and Defendants' motions be granted. Plaintiffs filed Objections (Doc. #126; Doc. #127), to which Defendants filed Responses (Doc. #130; Doc. #131; Doc. #132). Plaintiffs then filed Replies (Doc. #137; Doc. #138), to which a Surreply (Doc. #141) was filed.   On June 14, 2013, the undersigned heard extensive oral arguments on the objections.   (Doc. #153.)

During oral argument, the undersigned inquired whether any party felt there was a "ripeness" issue in the case.   The Court ultimately directed that any party wishing to assert an issue

---

[1]Unless otherwise stated, docket numbers refer to the lead case, Case No. 2:11-cv-578-FtM-29CM.   The Court will cite the administrative record as "AR" followed by the page number.

challenging the subject matter jurisdiction of the court file a motion to dismiss by August 6, 2013.  (Doc. #163.)

In response, the Federal Defendants[2] and intervenor defendant Safari Club International (Safari Club) filed motions to dismiss for lack of subject matter jurisdiction.  (Doc. #164; Doc. #165.) Plaintiffs filed Oppositions (Doc. #168; Doc. #169) to the motions to dismiss.  Plaintiffs have filed supplemental authorities (Doc. #171; Doc. #172; Doc. #174), prompting the Federal Defendants to file a Motion to Strike (Doc. #175).  Plaintiffs filed oppositions to the motion to strike (Doc. #178; Doc. #179), and additional notices of supplemental authority have been filed (Doc. #181; Doc. #183; Doc. #184; Doc. #185).

## I.

The Court accepts and adopts Section I and Section II of the Report and Recommendation (Doc. #123, pp. 2-32),[3] captioned "Relevant Environmental Statutes and Executive Orders" and "Factual and Procedural Background" respectively.  In summary, Congress established the Big Cypress National Preserve (the Original Preserve or the Preserve) in 1974 to "assure the

---

[2] The Federal Defendants consist of the United States Department of the Interior, the National Park Service, the United States Fish and Wildlife Service, S.M.R. Jewell, in her official capacity, Jonathan B. Jarvis, in his official capacity, and Daniel M. Ashe, in his official capacity.

[3] The page references for documents filed with the court refer to the numbers on the **upper right hand corner** generated by CM/ECF, not the page numbers on the bottom of the pages.

preservation, conservation, and protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress watershed in the State of Florida and to provide for enhancement and enjoyment thereof." An Act to Establish the Big Cypress National Preserve in the State of Florida, Pub. L. No. 93-440, § 1, 88 Stat. 1258 (1974) (codified at 16 U.S.C. § 698f(a)). The Secretary of the Interior (the Secretary) was authorized to acquire property within the Preserve, 16 U.S.C. § 698f(c), and required to administer the Preserve as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity in accordance with the provisions of sections 698f to 698m-4 of this title and with the provisions of sections 1, 2, 3, and 4 of this title, as amended and supplemented." 16 U.S.C. § 698i(a). The original Preserve was over 574,000 acres.

The National Park Service's (NPS) allowance of motorized recreational off-road vehicles (ORVs) in the Original Preserve has been a hotly contested and litigated subject since at least 1995. Ultimately, a 2000 General Management Plan and a Final Recreational Off-Road Vehicle Management Plan addressed ORV use in the Original Preserve. Resolution of the resulting litigation concerning that General Management Plan can be found at Defenders of Wildlife v. Salazar, 877 F. Supp. 2d 1271 (M.D. Fla. 2012).

In 1988, Congress authorized the acquisition of what is referred to as the Addition lands, consisting of approximately 147,000 acres adjacent to the Original Preserve.  The NPS has acquired approximately 112,400 acres of the Addition lands, with the remaining acreage still being owned by private owners or various State of Florida entities.  While there are approximately 244 miles of ORV trails on the Addition lands which pre-date the 1988 Congressional authorization, these trails were closed to public use when the NPS began administering the Addition lands in 1996.

Because the Addition lands were not covered by the 2000 General Management Plan for the Original Preserve, the NPS began drafting a separate general management plan for the Addition lands, which included an ORV use component.  In due course, decisions were made by the Federal Defendants which are reflected in the following five documents: (1) an Addition Wilderness Eligibility Assessment of March 2010 approved by the NPS Director on May 12, 2010 (AR 7381-7394); (2) a Final General Management Plan/Wilderness Study/Off-Road Vehicle Management Plan/Environmental Impact Statement (the Addition GMP/EIS) authored by the NPS and dated October 20, 2010 (AR 12801-13418); (3) a Biological Opinion authored by the Fish and Wildlife Services (FWS) and dated November 18, 2010 (AR 8583-8670); (4) an Incidental Take Statement authored by the FWS and dated November 18, 2010 (AR

8631-8634); and (5) a Record of Decision authored by the NPS and dated February 4, 2011 (the 2011 ROD) (AR 13494-13616).

Among other things, the 2011 ROD selected the preferred alternative from the Addition GMP/EIS.  The preferred alternative allows recreational ORV use in Addition lands on designated trails within 49,449 acres designated as "backcountry recreation;" provides for the future designation of approximately 130 miles of primary ORV trails in three phases; prohibits ORV use in 96,413 acres designated as "primitive backcountry;" and purposes 47,067 acres for "wilderness" designation.

## II.

Complaints filed by the National Parks Conservation Association and John Adornato (the "NCPA Plaintiffs") (Case No. 2:11-cv-578), and the Public Employees for Environmental Responsibility (PEER), the Florida Biodiversity Project, the Sierra Club, the South Florida Wildlands Association, Wilderness Watch, and Brian Scherf (the "PEER Plaintiffs," and collectively with the NCPA Plaintiffs, "Plaintiffs") (Case No. 2:11-cv-647), challenge the validity of these decisions for various reasons. Plaintiffs ask the Court to vacate and set aside those decisions and remand the matter of recreational ORV use in the Addition to the NPS for further consideration.

Approximately two years into the case, the Federal Defendants and the Safari Club asserted for the first time that the Court

lacks subject matter jurisdiction.  The Federal Defendants assert the lack of subject matter jurisdiction for three "separate but related reasons": (1) most of the claims are not ripe for adjudication; (2) Plaintiffs lack standing to pursue the remaining claims; and (3) there has been no "final agency action," as required for subject matter jurisdiction under the Administrative Procedure Act (APA).  (Doc. #164, pp. 3-4.)  The Safari Club focuses on the lack of standing, but also refers to ripeness. (Doc. #165.)  Assuming subject matter jurisdiction exists, Defendants urge the Court to adopt the Report and Recommendation and enter judgment in their favor.

Plaintiffs in both cases assert that the Court does have subject matter jurisdiction, but object to various findings and conclusions in the Report and Recommendation.  Plaintiffs seek judgment on the merits in their favor.

## A.   Subject Matter Jurisdiction Generally

The threshold issue is whether the Court has subject matter jurisdiction over any of the claims set forth in the Complaints. Both ripeness and standing are components of a district court's subject matter jurisdiction.[4]  Subject matter jurisdiction cannot be waived or forfeited by the parties[5]; subject matter jurisdiction

_____

[4]National Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003) (ripeness); Clapper v. Amnesty Int'l USA, 133 S.Ct. 1138, 1146-47 (2013) (standing).

[5]Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("Subject-

may (indeed must) be raised by the court *sua sponte*[6]; and subject matter jurisdiction can be raised at any time during the litigation.[7]

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." <u>Gunn v. Minton</u>, 133 S. Ct. 1059, 1064 (2013) (quoting <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994)). "Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." <u>Genesis Healthcare Corp. v. Symczyk</u>, 133 S. Ct. 1523, 1528 (2013) (citation and internal quotation marks omitted). <u>See also</u> <u>Susan B. Anthony List v. Driehaus</u>, 134 S. Ct. 2334, 2341 (2014). The party invoking a federal court's jurisdiction has the burden of establishing

---

matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety.")

[6]<u>Gonzalez</u>, 132 S. Ct. at 648 ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented.")

[7]Fed. R. Civ. P. 12(h)(3); <u>Sebelius v. Auburn Reg'l Med. Ctr.</u>, 133 S. Ct. 817, 824 (2013) ("Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy.")

subject matter jurisdiction.   *Driehaus*, 134 S. Ct. at 2342; *Kokkonen*, 511 U.S. at 378.

**B.   Ripeness**

"Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (citation and internal quotation marks omitted); *National Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).   To determine whether a claim is ripe for judicial review, courts consider both "the fitness of the issues for judicial decision" and "the hardship of withholding court consideration." *Stolt-Nielsen S.A.*, 559 U.S. at 670 n.2; *National Park Hospitality Ass'n*, 538 U.S. at 808.   Courts consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).   In the administrative context, ripeness is a justiciability doctrine designed to prevent the courts from entangling themselves in abstract disagreements over administrative policies and to shield agencies from judicial interaction until an administrative decision has been formalized and its effects felt in a concrete

way by the challenging parties.  Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, 727 F.3d 1349, 1356 (11th Cir. 2013) (citations omitted).  Generally, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal citation and quotation marks omitted).  The ripeness of a claim is a legal question.  Temple B'Nai Zion, Inc., 727 F.3d at 1356.[8]

**C.   Standing**

"In order to invoke federal-court jurisdiction, a plaintiff must demonstrate that he possesses a legally cognizable interest, or 'personal stake,' in the outcome of the action.  This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." Genesis Healthcare, 133 S. Ct. at 1528 (internal citations omitted).  For constitutional standing, "plaintiff must have suffered or be imminently

---

[8]The Federal Defendants suggest that the Court can consider the affidavits filed by Plaintiffs concerning standing on the issue of ripeness, and thus the matter may need to be resolved as a motion for summary judgment.  (Doc. #164, p. 13 n.5.)  Although the Court agrees it can consider the affidavits, subject matter jurisdiction is not a decision on the merits, and is resolved as a motion to dismiss, not summary judgment.  Aqua Log, Inc. v. Lost and Abandoned Pre-Cut Logs and Raft of Logs, 709 F.3d 1055, 1058 (11th Cir. 2013); Goodman v. Sipos, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001).

threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  "Prudential" standing is "a doctrine not derived from Article III and 'not exhaustively defined' but encompassing (we have said) at least three broad principles: 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'"  Id. (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004)). "Standing is not dispensed in gross.  Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008).  As the parties invoking the Court's jurisdiction, plaintiffs bear the burden of establishing standing. Driehaus, 134 S. Ct. at 2342; Lujan, 504 U.S. at 560-61.

**D.    APA Final Agency Action Requirement**

The APA states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review," 5 U.S.C. § 704, and defines "agency action" as including

"the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13).  Because the definition of "agency action" under the APA is so broad, the critical inquiry is whether the action is final.  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001).  The test for finality involves two steps: "First, the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted).  See also Sackett v. EPA, 132 S. Ct. 1367, 1371-72 (2012).  By contrast, a nonfinal agency order is one that "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action."  National Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1237 (11th Cir. 2003) (quoting Rochester Tel. Corp. v. United States, 307 U.S. 125, 130 (1939)).  The presence of a final agency action is a jurisdictional requirement.  Norton, 324 F.3d at 1236.

**E.  Substantive Legal Principles**

The Court adopts the portions of the Report and Recommendation (Doc. #123) setting forth the elements of the various statutes, regulations, and executive orders at issue in this case, as

supplemented below.   The Court also adopts its prior discussion of these statutes, regulations, and executive orders in <u>Defenders of Wildlife v. Salazar</u>, 877 F. Supp. 2d 1271 (M.D. Fla. 2012). Additional substantive principles will also be discussed within this Opinion and Order.

**F.   Standards of Review**

A court may set aside an agency's actions, findings, or conclusions only if they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.   5 U.S.C. § 706(2).   This is an exceedingly deferential standard in which "[t]he court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." <u>Sierra Club v. Van Antwerp</u>, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted).   An agency action may be found arbitrary and capricious "where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Defenders of Wildlife v. United States Dep't of the Navy</u>, 733 F.3d 1106, 1115 (11th Cir. 2013) (citation omitted).   This standard of review provides a court with the least

latitude in finding grounds for reversal, and allows setting aside administrative decisions only "for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached." Citizens for Smart Growth v. Sec'y of the Dep't of Transp., 669 F.3d 1203, 1210 (11th Cir. 2012) (quoting Fund for Animals v. Rice, 85 F.3d 535, 541-42 (11th Cir. 1996)). A court must "defer to the agency's technical expertise," City of Oxford v. FAA, 428 F.3d 1346, 1352 (11th Cir. 2005) (citation omitted), because when it "is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential," Defenders of Wildlife v. Bureau of Ocean Energy Mgmt., 684 F.3d 1242, 1248-48 (11th Cir. 2012) (quoting Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009)). This deferential standard applies even in the context of summary judgment. Preserve Endangered Areas of Cobb's History v. United States Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996).

Administrative decisions under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370 (NEPA), are reviewed under the APA's highly deferential standard. Van Antwerp, 526 F.3d at 1360; Defenders of Wildlife v. United States Dep't of Navy, 733 F.3d at 1115. An agency's compliance with the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544 (ESA), is also reviewed

under this deferential APA standard.  Defenders of Wildlife v. Bureau of Ocean Energy Mgmt., 684 F.3d at 1248.  Similarly, agency action under the Wilderness Act is reviewed under the deferential APA standard.  Wilderness Watch v. Mainella, 375 F.3d 1085, 1087-88 (11th Cir. 2004); Wyoming v. USDA, 661 F.3d 1209, 1226-27 (10th Cir. 2011).

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify the magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); United States v. Powell, 628 F.3d 1254, 1256 (11th Cir. 2010).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C).  See also United States v. Farias-Gonzalez, 556 F.3d 1181, 1184 n.1 (11th Cir. 2009).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party."  Jeffrey S. v. State Bd. of Educ., 896 F.2d 507, 512 (11th Cir. 1990) (quoting H.R. 1609, 94th Cong., § 2 (1976)).  The district judge reviews legal conclusions *de novo*, even in the absence of an objection.  See Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 604 (11th Cir. 1994).

### III.

The Court will address subject matter jurisdiction and the objections to the Report and Recommendation on a claim-by-claim basis.

**A.   APA Violation Based on Wilderness Act Violation**

Count One in Case No. 2:11-cv-578 alleges that the Department of the Interior and the NPS violated the APA because the ORV plan for the Additions lands violated the Wilderness Act of 1964, and hence violated the APA requirement that agency actions, findings, and conclusions be "in accordance with law."  5 U.S.C. § 706(2)(A). Specifically, Count One asserts that the Federal Defendants' determination that more than 40,000 acres of Addition lands were not eligible for protection as "wilderness" was the result of the wrongful application of the requirements of the Wilderness Act in at least six specific ways.  (Doc. #1, ¶ 58(a)-(f).)  Similarly, Count One in Case No. 2:11-cv-647 alleges that the Federal Defendants violated the Wilderness Act and hence violated the APA. (Doc. #1, ¶¶ 87-89.)[9]

The Court has adopted the Report and Recommendation's summary of the Wilderness Act requirements and the related NPS management policies.  (Doc. #123, pp. 11-13.)  In sum, the Wilderness Act of

---

[9]The PEER Plaintiffs have noted that they have "significantly narrowed the scope of the claims for which they are now seeking relief in their Objections to the Magistrate Judge's Report and Recommendation and at the oral argument."  (Doc. #169, p. 5 n.4.)

1964, 16 U.S.C. §§ 1131-36, established a process by which lands could be designated as "wilderness" areas.  Under the Wilderness Act, the Secretary of the Interior is required to review certain lands within the national park system for eligibility as "wilderness" and to recommend to the President whether the land is suitable or not suitable for preservation as wilderness.  16 U.S.C. § 1132(c); 43 C.F.R. § 19.3.  In practice, the NPS evaluates the land to determine its wilderness eligibility (i.e., its suitability for preservation as wilderness), and makes its recommendation to the Secretary of the Interior.  After satisfying certain statutory requirements, 16 U.S.C. § 1132(d), the Secretary of the Interior makes a recommendation to the President of the United States "as to the suitability or nonsuitability of each such area" for preservation as wilderness, 16 U.S.C. § 1132(c). The President, in turn, makes recommendations to Congress with respect to the designation as wilderness of each such area on which review has been completed.  16 U.S.C. § 1132(c).  No land actually becomes a "wilderness" area unless Congress enacts legislation to that effect.  Id.

The Court also adopts (with two exceptions) the Report and Recommendation's factual findings related to the Wilderness Act (Doc. #123, pp. 32-40)[10] as supplemented below.  In sum, a 2006

---

[10]The two exceptions are: (1) the word "Plaintiffs" at page 39, line 3 should be "Defendants"; and (2) the "14,602" at page 40

- 17 -

NPS eligibility assessment found that 111,601 acres of Addition lands were eligible for designation as wilderness.  A NPS re-assessment in 2010 found that only 71,263 acres of Addition lands were wilderness eligible, a reduction of approximately 40,000 acres.  The new figure was included in the Addition GMP/EIS and the 2011 ROD.  The NPS has made this wilderness recommendation to the NPS Director, but the administrative record is not clear whether the recommendation has been forwarded to the Department of the Interior.  (Doc. #123, p. 33.)

In a post-oral argument submission, the Federal Defendants state that the NPS "has completed a wilderness proposal based on the 2010 wilderness eligibility assessment attached to the Addition GMP/EIS and the wilderness study included in the Addition GMP/EIS" and that the "NPS is currently managing all areas found wilderness eligible in the 2010 wilderness eligibility assessment as wilderness."  (Doc. #164, p. 7.)  The PEER Plaintiffs suggest that the Secretary has now made a recommendation to the President. (Doc. #169, p. 12 n.8.)

**(1)  Ripeness**

Defendants do not specifically address the ripeness of the Wilderness Act claims,[11] but both sets of Plaintiffs discuss the

---

footnote 25 should be "14,202."

[11]Nonetheless, the Court has an independent obligation to consider the ripeness of all claims.

ripeness of the claims at some length.  (Doc. #168, pp. 16-20; Doc. #169, pp. 11-15.)  Generally, Defendants assert that the claims are not ripe because recreational ORV use in the Addition has not occurred and cannot lawfully occur absent completion of the rulemaking process.

Plaintiffs' Wilderness Act claims, however, challenge only the 2010 NPS wilderness determination, which reduced the eligible acreage by about 40,000 acres from the 2006 NPS determination. For the Wilderness Act claims, the alleged injury is not ORV use, but the failure to include the 40,000 acres in the mix for potential Congressional wilderness designation.  The ultimate substantive issue in these claims is whether the Federal Defendants violated the Wilderness Act when they excluded the 40,000 acres from their wilderness Eligibility Determination.  Resolution of this issue is not dependent upon actual ORV use in Addition land.

It is unclear if Plaintiffs are correct when they state that in light of the 2010 NPS Eligibility Determination, "no recommendation for wilderness protection could legally include the 40,000 acres which NPS had ruled out as wilderness eligible." (Doc. #168, p. 18.)[12]  Nonetheless, it is at least substantially

---

[12]Nothing on the face of the Wilderness Act requires the President or Congress to accept the Secretary's recommendation on an all-or-nothing basis, and the statute requires that the other views submitted to the Secretary be included with any recommendation to the President or Congress.  16 U.S.C. § 1132(d)(2).

less likely the 40,000 acres would be included in a recommendation. Further, it is undisputed that, in light of the 2010 re-assessment, the NPS is no longer managing the 40,000 acres to preserve eligibility for wilderness designation, as its policy would dictate if the 40,000 acres had been found wilderness eligible. Nothing more need be done by the Federal Defendants to focus the Wilderness Act issue. The Wilderness Eligibility Assessment has been made, and there is no suggestion that anything is in the works to change it. Judicial action will not inappropriately interfere with further administrative action regarding the Wilderness Eligibility Assessment, since no additional action is necessary as to that determination. Plaintiffs have shown that a delayed review will cause them undue hardship since management of the 40,000 acres is no longer with an eye toward preserving wilderness eligibility, and the current management may itself undermine wilderness eligibility. The Court concludes that the Wilderness Act claims are ripe for adjudication.

**(2) Standing**

Defendants challenge only the first prong of the constitutional standing requirements, asserting that Plaintiffs lack standing because Plaintiffs have not established injury-in-fact that is concrete and particularized. Defendants assert that Plaintiffs' only alleged injury - speculative future injury resulting from recreational ORV use in the Addition lands - is

insufficient under constitutional standing principles. (Doc. #164, pp. 4, 19-21.) Safari Club also challenges the standing of certain specific Plaintiffs. (Doc. #165, pp. 3-16.) Plaintiffs disagree both generally and in connection with the Wilderness Act claims. (Doc. #168, pp. 20-26; Doc. #169, pp. 11-18.)

As noted above, the injury in the Wilderness Act claims is not ORV use on Additions land, but the failure to include the 40,000 acres as eligible for wilderness designation. The failure to include the 40,000 acres is not speculative and is not a future event. The decision has been made by the NPS, and the NPS's post-oral argument submission establishes that the NPS is acting pursuant to its 2010 Wilderness Eligibility Assessment. The Court finds that all Plaintiffs have established the injury-in-fact constitutional standing requirement for the Wilderness Act claims.

The more substantial Wilderness Act standing issue, not raised by any Defendant, is the redressability prong of the constitutional standing requirements. In order for Plaintiffs to show that they have standing, they must demonstrate that their alleged injury is redressable by a favorable ruling or decision. Clapper, 133 S. Ct. at 1147; Fla. Wildlife Fed'n, Inc. v. South Fla. Water Mgmt. Dist., 647 F.3d 1296, 1303-04 (11th Cir. 2011). The Eleventh Circuit has stated that redressability is "one of the more amorphous requirements of modern standing doctrine." I.L. v. Alabama, 739 F.3d 1273, 1279 (11th Cir. 2014). As a general

matter, however, "[r]edressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." Fla. Wildlife Fed'n, 647 F.3d at 1303-04 (quoting Mulhall v. Unite Here Local 355, 618 F.3d 1279, 1290 (11th Cir. 2010).

In Wilderness Soc'y v. Norton, 434 F.3d 584, 591 (D.C. Cir. 2006), the court stated that "[n]o legal consequences flow from the [NPS's] recommendations" concerning wilderness designation, and held that the NPS's failure to make wilderness recommendations or forward recommendations to the President were not redressable injuries because no court order could require Congress to designate particular lands as wilderness.  It is certainly correct that a court order in this case could not require Congress to designate the 40,000 acres as wilderness.  A court order could, however, require the NPS to reconsider its Wilderness Eligibility Assessment in compliance with the Wilderness Act.  That relief could in turn result in a return to the 2006 eligibility assessment, or some other assessment which included more or different acreage.  While such relief would not necessarily result in Plaintiffs ultimately receiving the wilderness designation they desire, redressability does not require complete victory or full relief.  Massachusetts v. EPA, 549 U.S. 497, 525-26 (2007).  At the least, such a judicial order would bring the 40,000 acres

within the NPS policy of managing the acres in a manner to preserve their eligibility for wilderness designation.

Because a favorable decision in this case could significantly increase the likelihood that all the Plaintiffs would obtain relief that directly redresses the Wilderness Act injury they suffered, the Court concludes that the Wilderness Act claims satisfy this prong of the constitutional standing standard. The Court further finds that all Plaintiffs have satisfied all other constitutional standing requirements, as well as the prudential standing requirements.

### (3)  APA Final Agency Action

Defendants argue that because the 2011 ROD does not authorize any actual recreational ORV use, and because such ORV use cannot occur until the NPS has issued a special rule authorizing it, there has been no "final agency action" as required for jurisdiction under the APA.  (Doc. #164, pp. 4-5.)  In response, Plaintiffs assert that the Wilderness Eligibility Assessment is the final agency action for their Wilderness Act claims.  The Magistrate Judge found that the wilderness eligibility determination by the NPS was "in a sense a 'final agency action'" because under the NPS policy, the designation triggered management of the acres by the NPS to preserve their eligibility for wilderness designation. (Doc. #123, p. 42.)

The Court finds that for Wilderness Act purposes, there has been a final agency action by the NPS regarding the 40,000 acres. Those acres have been excluded from wilderness eligibility by an NPS Wilderness Eligibility Assessment approved by the NPS Director.  As a legal consequence, the 40,000 acres will not be recommended for wilderness designation, and the NPS has already ceased managing them in a manner to preserve their wilderness character.  Nothing remains to be done by the NPS with regard to its wilderness determination of Addition lands.  Therefore, the Court agrees with Plaintiffs that the Wilderness Eligibility Assessment approved by the NPS Director is a final agency action.

**(4)  Merits Discussion**

The Report and Recommendation found that the 40,000 acre reduction in wilderness eligible acres was not arbitrary, capricious, an abuse of discretion, or in violation of the Wilderness Act.  (Doc. #123, pp. 32-45.)  All Plaintiffs object to these findings.

Plaintiffs assert the record establishes that the re-assessment of wilderness eligible acres was manipulated to satisfy political demands for more ORV trails and was based on new criteria (variously referred to as rules of decision, principles, or assumptions) for which there was no adequate legal explanation and which were inconsistent with the Wilderness Act.  The new NPS criteria were arbitrary and capricious, Plaintiffs assert, because

they essentially required that areas be more pristine than Congress demanded of wilderness-eligible land. More specifically, Plaintiffs object to the 2010 NPS principles that the existence of human disturbance be determined by the existence of an unimproved trail used substantially over time and requiring substantial human intervention to restore (as opposed to the 2006 principle which looked only to elevated roads and trails which required significant engineering); that the determination of whether human imprint was "substantially unnoticeable" be determined from the perspective of a land manager, rather than a common visitor (as was done in 2006); and that the Addition's wilderness eligibility assessment be considered separately from the Original Preserve (which was found in 1979 to contain no wilderness areas). Plaintiffs also object to the new principle which widened buffer corridors for ORV primary trails from 50-100 feet to half a mile (2,640 feet). The NPCA Plaintiffs further object that the Report and Recommendation failed to state any conclusion about whether the NPS acted "not in accordance with law" regarding the Wilderness Act. (Doc. #126, pp. 9-22; Doc. #127, pp. 8-18.)

Both the Federal Defendants and the Intervening Defendants oppose the objections, and seek to have the Court adopt the Report and Recommendation. (Doc. #130; Doc. #131.)

The Court has already adopted the factual background and procedural history as set forth in the Report and Recommendation

and (with two exceptions) its Wilderness Act findings. (Doc. #123, pp. 13-40.) The Court also adopts the Report and Recommendation's statements about the standard of review under the APA. (Doc. #123, pp. 41-42.) The remainder of this section of the Report and Recommendation recommends that the Court give the NPS's interpretation of the phrase "imprint of man's work substantially unnoticed" some deference and not pass judgment on the NPS's wilderness eligibility designation. (Doc. #123, pp. 42-45.) The Court declines to accept the latter portion of this section of the Report and Recommendation.

While it is easy to get bogged down in minutiae, what the NPS was attempting to determine was which, if any, portions of the Addition land satisfied the definition of "wilderness" in the Wilderness Act. The Wilderness Act defines "wilderness" as follows:

> A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other

> features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).   As the Report and Recommendation understated, the positions of the interested parties has been "fairly polarized." (Doc. #123, p. 21.)   No determination will please everyone, and recent history has demonstrated that almost any NPS determination related to recreational ORV use in the Preserve or Addition results in litigation.   The record demonstrates extensive, good faith efforts by the NPS to make appropriate Wildlife Act assessments.   After a *de novo* review of the record, the Court finds that the 2010 re-assessment of wilderness eligibility was not the result of manipulations based on politics, but the result of agencies attempting to arrive at appropriate decisions.

The Court also finds that the use of different assumptions or principles by the NPS in 2010 was not arbitrary, capricious, or an abuse of discretion, the new principles were not inconsistent with the Wilderness Act, and they did not violate the Wilderness Act. The administrative record establishes that neither the 2006 assumptions nor the 2010 assumptions are entitled to Chevron[13] deference.   Both are, however, entitled to some limited deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944), given the

---

[13]Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

agency's experience and expertise with recreational ORV use in the Preserve and its former use in the Addition.

While an unexplained change may be a basis to find an arbitrary and capricious determination, this "is reserved for rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or contradictory that we are left in doubt as to the reason for the change in direction." Lands Council v. Martin, 529 F.3d 1219, 1225 (9th Cir. 2008). "Agency inconsistency is 'at most' a reason for concluding that an action is arbitrary and capricious only when the change in position is inadequately explained." McMaster v. United States, 731 F.3d 881, 892 n.5 (9th Cir. 2013) (citing Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981-82 (2005)). As the Report and Recommendation found (Doc. #123, pp. 25, 36-37), the NPS explained its reasons for the changes from 2006 to 2010, and these explanations have record support. Plaintiffs' disagreement with the stated reasons does not render the changes unexplained. The Court finds that the different assumptions and explanations used by the NPS in 2010 were rational, and that the NPS's actions were not arbitrary or capricious, an abuse of discretion, or in violation of the Wilderness Act.

The expansion of the width of all primary ORV trail corridors from roughly 50-100 feet to 2,640 feet (a half mile) requires more discussion. Under the Addition ORV Plan, areas within the half-

mile buffer corridors are not eligible for wilderness designation, and the half-mile corridors result in other areas being too fragmented to manage as wilderness (e.g., all lands in the Western Addition).  (Doc. #123, pp. 23, 31.)  Several explanations for this corridor expansion are in the record.

As the Report and Recommendation states (Doc. #123, pp. 25-26), the February 17, 2010 Wilderness Workshop reported that the buffers surrounding the Levee-28 Interceptor Canal, roadways, and active ORV trails in the 2006 assessment were ineligible for wilderness designation.  (AR 7160.)  In reaching this conclusion, the workshop noted that humans' imprint along the man-made trail segments north of Interstate 75 are substantially noticeable when on the ground and that "man-made items are visible adjacent to the trail, including old buses, etc." (Id.)  In addition, motorized use would continue along the trails regardless of any future management action because access to private property in the Addition must be maintained.  Given that motorized use of the trails would continue, it was determined that the lands adjacent to the trails were ineligible for wilderness designation because "these areas would not offer outstanding opportunities for solitude and a primitive and unconfined recreation.  Without a buffer, such opportunities would not be possible due to continued motorized activity." (Id.)[14]

---

[14]"Audibility distance for ORV noise are on the order of 0.5-

The discussion then turned to the width of the buffer.  The workshop concluded that the buffer width established in 2006 "was too narrow to offer opportunities for solitude of primitive recreation.  As a result, the trail buffer width was widened to a quarter mile on either side of the trail segments."  (AR 7160.)[15] Although humans' imprint beyond the imprint of the trails varies throughout the Addition, the workshop "concluded that the buffer should be applied consistently to ensure that these areas remain practicable for management."  (Id.)  "In sum, the trails and a quarter mile buffer on either side of the trail are ineligible for wilderness because they are and will continue to be used to access private property and for tribal sustainable use and occupancy in the Addition."  (Id.)

The roadways north of Interstate 75 and the Levee-28 interceptor canal were also reviewed at the February 17, 2010 Wilderness Workshop.  "Given past engineering, construction, and maintenance; continued motorized use and access for infrastructure maintenance (regardless of any future management actions), and that the previous width was too narrow to offer opportunities for

---

2 miles, but may differ given changes in background and human noise levels, vegetation cover, and type of ORV uses."  (AR 13044.)

[15]An overwhelming majority of public comments have "indicated that the use of off-road vehicles in the Addition would create impacts to natural resources and to opportunities for visitors to experience solitude."  (AR 13046.)  The use of ORVs "impacts the natural soundscape and solitude that many non-ORV users seek." (Id.)

solitude or primitive recreation, the area of ineligible land was expanded." (AR 7161.)[16]  The prior buffer distance of 35 to 50 feet was therefore expanded to a quarter mile on either side of Interstate 75, U.S. Highway 41, State Road 29, and the Levee-28 Interceptor Canal.  (AR 7161.)[17]

Following the February 17, 2010 Wilderness Workshop, concerns were raised within the NPS regarding the adequacy of the rationale for expanding the buffers from 50-100 feet to a half mile.  (AR 7171-72, 7246, 7254-55, 7311.)  A memo dated March 5, 2010, stated that some of the buffer zones out west are so narrow that parks are seeing uses inappropriate for wilderness.  Narrow buffer zones also render necessary management actions difficult or impossible. For example, road washout in the northwest cannot be repaired because the only available realignment is in designated wilderness.  (AR 7254-55.)

Following further investigation, the NPS augmented the description and rationale for the "non-wilderness corridors" in the May 2010 Wilderness Eligibility Assessment.  The Assessment stated that expansion of all buffer corridors to a half mile was to accommodate "environmental protection and safety

---

[16]The noise from Interstate 75 can be heard thousands of feet in the interior of the Addition.  (AR 13046.)

[17] The Florida Department of Environmental Protection recommended a half-mile buffer surrounding Interstate 75 and State Road 29 "to accommodate maintenance of current and future roadway infrastructure."  (AR 13343.)

considerations, such as for fire management, exotic/invasive plant and animal control, hunting and retrieval of game, and traditional uses including the gathering of native materials." (AR 7391.) As an example, the Wilderness Eligibility Assessment stated:

> [A]ll constructed roads, trails, and canal embankments represent a change in elevation that provides an opportunity for non-native plant invasion. The road shoulder, even if represented by inches in change from natural wetland grade, provides space above standing water for seeds to germinate if a source is nearby. Most exotic invasives become established more easily in disturbed areas such as raised road shoulders and other significant constructed features. Specific management techniques, including mechanical treatment are required in these areas to maintain the ecological integrity of the Preserve.

(Id.) The NPS argues that the mechanically constructed trails in the Addition and the need for future removal of exotic vegetation by mechanical means properly precludes wilderness eligibility. (Doc. #130, pp. 17-18.) The NPS also refers to sidecast debris and borrow pits in several graded areas. (AR 13295.) Plaintiffs assert that none of the rationales justify the dramatic increase in corridor width. (Doc. #126, pp. 20-22; Doc. #127, pp. 17-18.)

The Court begins by acknowledging that this buffer corridor expansion is entitled to some deference based upon the NPS's experience and expertise with recreational ORV vehicles in the Preserve for over thirty years. The issue is not whether the Court agrees with the buffer width decision, but whether it is arbitrary and capricious. The Court agrees with the Federal Defendants that the mere fact that the buffer zones differ in size

from 2006 to 2010 does not render the 2010 assessment arbitrary and capricious. (Doc. #130, p. 17.) This does not, however, end the Court's review.

It is not clear if Plaintiffs are challenging the half-mile corridors around the roadways and canal. If so, the Court finds that the record supports the half-mile buffer surrounding Interstate 75, U.S. 41 (also known as Tamiami Trail), State Road 29, Wagonwheel Road, and the Levee-28 Interceptor Canal. Interstate 75,[18] and to a lesser extent, U.S. 41, State Road 29, and Wagonwheel Road[19] will be subjected to continued motorized use as well as periodic maintenance and improvements regardless of any future management actions in the Addition. (AR 13034-35, 13045.) The area around the roads is not untrammeled by humans, and evidence of past disturbances from road construction remains noticeable, such as canals and borrow pits. (AR 7388-89.) Disturbances from canal engineering, construction activities, and maintenance are also visible on the sides of the Levee-28 Interceptor Canal, which runs through the northeast portion of the Addition. (AR 7385, 12833.) Accordingly, the Court finds that the rationale in the record supports the half-mile buffer

---

[18]Interstate 75 provides the main interstate access route between Fort Lauderdale/Miami and Tampa Bay and is traversed by more than six million vehicles each year. (AR 12864.)

[19]Wagonwheel Road is in an unpaved, graded, gravel-based road that crosses approximately one mile of the Addition. (AR 13034.)

surrounding Interstate 75, U.S. 41, State Road 29, Wagonwheel Road, and the Levee-28 Interceptor Canal.

The Court also finds that the half-mile buffer for all primary ORV trails is supported by the record. While it is not intuitive that the same half-mile buffer needed for Interstate 75 is needed for the primary ORV trails, there is sufficient evidence in the record to support the NPS's decision. The NPS determined that expanded buffer corridors were necessary for environmental protection and safety and noted that the frequency of administrative access requiring exceptions to wilderness restrictions would defeat the purpose of wilderness in the expanded buffer corridors. (AR 13500, 6489-90.) Furthermore, the half-mile buffer allows for enough flexibility for siting the primary trails and provides for future trail relocation, if necessary. (AR 12928.)

The Court therefore concludes that summary judgment in favor of Defendants on Count I of the Complaints is appropriate.

**B.   APA Violation Based on NPS Organic Act and Preserve and Addition Establishment Acts Violation**

Count Two in Case No. 2:11-cv-578 alleges that the Department of the Interior and the NPS violated the APA because the ORV plan for the Addition lands violated the National Park Service Organic Act of 1916 (the Organic Act) and the Establishment Acts creating the Preserve and Addition, and hence violated the APA requirement

that agency action, findings and conclusions be "in accordance with law." 5 U.S.C. § 706(2)(A). Specifically, it is asserted that the Federal Defendants violated these Acts by (1) impairing the resources or values of the Addition, (2) improperly elevating recreational use of ORVs over conservation, and (3) administering the Addition in a manner inconsistent with the Acts. (Doc. #1, ¶¶ 62-76.) The NPCA Plaintiffs have since clarified that their only claim in this count is that the NPS violated the mandate of the Acts that preservation predominate over recreation when in conflict. (Docs. #126, pp. 22-25; Doc. #162, p. 2; Doc. #168, p. 5.) A similar claim is asserted in Count Three in Case No. 2:11-cv-647 (Doc. #1, ¶¶ 96-101), but the PEER Plaintiffs continue to press an impairment claim (Doc. #127, p. 30 n.20).

Both the NPS Organic Act and the Preserve and Addition Establishment Acts are discussed in Defenders of Wildlife, 877 F. Supp. 2d at 1275-78, which is adopted here. The Court also adopts the legal discussion in the Report and Recommendation. (Doc. #123, pp. 75-76.) In short, under the NPS Organic Act "national parks are created with a conservation mandate, i.e., to conserve and preserve the scenery, wildlife, and objects (natural and historical) within their boundaries for present and future enjoyment." Defenders of Wildlife, 877 F. Supp. 2d at 1276. The Preserve and Addition, on the other hand, have both a conservation

mandate  and  a  mandate  to  allow  multiple  uses,  including
recreational ORV use on designated trails.  Id. at 1277-78.

The 2011 ROD included the NPS's "Determination of Impairment
for the NPS Preferred Alternative."  (AR 13515-24, 13601-08.)
This  Determination  found  that  the  impact  of  the  preferred
alternative would not rise to the level of "impairment" of the
Addition's natural resources and values.  (AR 13601-08.)  All
Plaintiffs assert that the ORV Plan for the Addition violates the
mandate  that  preservation  predominate  over  recreation  when  in
conflict.   Additionally,  the  PEER  Plaintiffs  assert  that  the
impairment  determination  violates  the  Organic  Act  and  the
Establishment Acts because the level of recreational ORV use in
the preferred alternative rises to the level of "impairment."

**(1)  Ripeness**

The Federal Defendants assert that these claims are not ripe
"because the activity that forms the basis for Plaintiffs' claims,
recreational off-road vehicle ('ORV') use in the Addition, has not
occurred and cannot lawfully occur absent a rulemaking."  (Doc.
#164, pp. 3, 16-17.)  These Defendants argue that there is no
binding precedent for a case like this, where the challenge to the
administrative decision is based on activity (recreational ORV
use) that is not occurring and cannot lawfully occur until the
rulemaking process is completed. (Doc. #164, p. 9.) The Federal
Defendants further assert that their decision can be challenged

"only if it directly authorized actions with real on-the-ground consequences." (Doc. #164, p. 10.) Plaintiffs, while recognizing that there are still steps to be taken before recreational ORV trails are actually opened, essentially argue that their challenge to the overall extent and adverse impacts of the Plan's ORV trails in the Addition is as ripe as it need be under existing case law. (Doc. #168, pp. 5-11; Doc. #169, pp. 23-28.)

As the Report and Recommendation accurately summarized, the preferred alternative which was accepted for recreational ORV use in the Addition incorporated many of the features of the Preserve ORV Plan, including that all ORV use be restricted to designated trails, nightly and seasonal closures of ORV trails, discretionary trail closures in the interest of safety and resource protection, and an ORV permit and inspection program. (Doc. #123, pp. 26-28.) The preferred alternative included approximately 130 miles of ORV trails as a conceptual primary trail network, with actual designation of trials to be accomplished in phases based on field conditions, proximity to access points, levels of trail stabilization necessary, and trail monitoring needs. The ORV trail system would be phased in over time, with additional trails designated, closed, relocated, maintained, or altered under an adaptive management system depending upon the impacts of the ORV trails on the Addition resources.

The Court finds that most components of these claims are ripe for adjudication.  In addition to the general ripeness discussion above, two cases guide the Court's determination.   In Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), the Supreme Court held that a non-NEPA judicial challenge asserting that a national forest management Plan wrongly favored logging and clearcutting was not ripe for adjudication.  The Plan itself did not authorize the cutting of any trees, although it made logging more likely because the existence of a Plan was a precondition to any logging.  Despite the Plan, the Forest Service had to take the following additional steps before it could permit actual logging: (a) "propose a specific area in which logging will take place and the harvesting methods to be used"; (b) "ensure that the project is consistent with the Plan,"; (c) "provide those affected by proposed logging notice and an opportunity to be heard"; (d) "conduct an environmental analysis pursuant to the National Environmental Policy Act of 1969 (NEPA) to evaluate the effects of the specific project and to contemplate alternatives"; (e) "subsequently make a final decision to permit logging, which affected persons may challenge in an administrative appeals process and in court"; and (e) "revise" the Plan "as appropriate." Id. at 729-730.  The Supreme Court found there was no hardship because the Plan did not command anyone to do or to refrain from doing anything, did not inflict significant practical harm on the

interests advanced by the plaintiff, and did not force the plaintiff to modify its behavior. The Supreme Court further found that judicial review at that time could hinder the agency's efforts to refine its policies through revision of the Plan or application of the Plan in practice. Further, judicial review at the time would not have the benefit of the focus that a particular logging proposal would provide. Id. at 732-737.

In Wilderness Soc'y v. Alcock, 83 F.3d 386 (11th Cir. 1996), the Eleventh Circuit found that a challenge to timber harvest provisions of a national forest management Plan was not ripe for judicial review. The Plan set timber harvest goals and possible future timber harvest levels, but required another level of decisionmaking that would determine precisely what site-specific action would be taken pursuant to the Plan. No harvesting would be done until the second-stage decisions were made, and a challenge to both the site-specific action and the Plan-level decisions could be made after the second-stage decisions were made. While the Plan made it "more likely" that there would be timber harvesting, it was not yet known when or how an injury to the plaintiffs would occur. Id. at 390-91.

The Court agrees with Plaintiffs that the specifics of the primary recreational ORV trails are not necessary to make these claims fit for adjudication because the NPS is already implementing the 2011 ROD with regards to recreational ORV use in the Addition.

While the availability of money and resources will undoubtedly impact the implementation of the Plan, it is undisputed that the NPS has begun to implement the Plan and has begun to spend money, even without a final rule.  There has been construction of a recreational access point at the Interstate 75 Mile Marker 51 for ORV use (Doc. #164, p. 5), which was authorized by the 2011 ROD (AR 12900).  The NPS anticipated, and has now started, the construction of two recreational access facilities at the Interstate 75 Mile Marker 63, which would include paved parking lots and other heavy construction, as authorized by the 2011 ROD. (Doc. #164, pp. 5-6; AR 12900; Doc. #169-1.)  The PEER Plaintiffs suggest that NPS personnel may have already begun "groundtruthing" the Addition ORV trails.  (Doc. #169, p. 4.)

The NPS's conduct is already affecting Plaintiffs, and there would be hardship to Plaintiffs if judicial review were denied. There is no undue judicial interference with further formulation of the details of the Plan, and there is not a need for further factual development of the record as to the primary trails. Additionally, the Court finds that Defendants have overstated the significance of the requirement of a new rule before ORV use could actually occur.  In the Preserve, this new rule was adopted virtually overnight.  Defenders of Wildlife, 877 F. Supp. 2d at 1285-1290.  The administrative journey required in this case is

far shorter than that required in <u>Ohio Forestry</u>, and has already
begun in earnest.

Two components of the PEER Plaintiffs' challenge are excluded
from this finding and are not ripe.  Plaintiffs' attack on the
general adoptive management of the Plan is the type of programmatic
challenge found premature in <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497
U.S. 871, 891 (1990).  Additionally, the PEER Plaintiffs' attempt
to challenge secondary trails is premature.  Everyone agrees that
before secondary trails may be allowed, the NPS must comply with
the NEPA requirements, which will provide an opportunity to have
meaningful input and an opportunity for objections.  (Doc. #123,
pp. 64-65.)  <u>See</u> <u>e.g.</u> <u>Ala. v. United States Army Corps of Eng'r</u>
(<u>In re</u> <u>MDL-1824 Tri-State Water Rights Litig.</u>), 644 F.3d 1160,
1181-85 (11th Cir. 2011) (matter not ripe where various required
written reports, including NEPA requirements, were not completed).

**(2)  Standing**

Defendants assert that Plaintiffs lack standing because their
asserted injuries are based on conjecture as to what may occur in
the Addition land based on what they claimed to have observed in
the Preserve.  Because recreational ORV use is not currently
authorized, Defendants argue that no Plaintiff has or can assert
a present injury-in-fact.  (Doc. #164, pp. 19-21.)

Safari Club further asserts that the impact of recreational
ORV use on the environment is not now, nor was it when the

Complaints were filed in October and November 2011, sufficiently certain or imminent. This is so because establishment of the ORV trails has not occurred, and is not certain to ever occur given the need for additional administrative steps and funding constraints.[20] Safari Club also asserts that Plaintiffs do not allege sufficiently concrete plans to visit the Addition at a time when ORV use might be occurring. (Doc. #165, pp. 3-10.) Safari Club further asserts that PEER, the Florida Biodiversity Project, and Wilderness Watch have such glaring standing deficiencies that they should not be further considered in determining whether any of the Plaintiffs in Case No. 2:11-cv-647 have standing. (Doc. #165, pp. 10-11.) Finally, Safari Club asserts that the Court must find at least one Plaintiff with standing in each of the two cases in order to allow each case to proceed. (Doc. #165, pp. 12-14.)

The Supreme Court recently discussed the injury-in-fact requirement of standing in Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334 (2014). The Court stated:

> This case concerns the injury-in-fact requirement, which
> helps to ensure that the plaintiff has a personal stake
> in the outcome of the controversy. An injury sufficient
> to satisfy Article III must be concrete and

---

[20]The Court rejects Safari Club's suggestion that standing is only examined as of the time of the filing of the Complaints. The party with the burden of establishing standing (here Plaintiffs) must establish standing at each stage of the proceedings. Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013). Standing as alleged in the Complaints was not challenged, but Plaintiffs must still establish standing now. Driehaus, 134 S. Ct. at 2342.

> particularized and actual or imminent, not conjectural
> or hypothetical.   An allegation of future injury may
> suffice if the threatened injury is certainly impending,
> or there is a substantial risk that the harm will occur.

Driehaus, 134 S. Ct. at 2341 (internal citations and quotation
marks omitted.)

In this case, the Court is satisfied that Plaintiffs have
established at least a substantial risk that the harm they assert
(recreational ORV use in the Addition) will occur due to the
Federal Defendants' actions (approval of the 2011 ROD and related
documents).   The NPS is taking steps in furtherance of the 2011
ROD, including steps which will lead directly to ORV use in the
Addition.   It is also spending money in furtherance of the Plan.
Plaintiffs need not wait for the first ORV track to be made in the
dirt before claiming an actual injury.   The Court therefore finds
that Plaintiffs have standing to assert the claims in these counts.

The Court also finds that PEER, the Florida Biodiversity
Project, and Wilderness Watch have established standing to
challenge the deviations from past practice, and Safari Club's
argument to the contrary (Doc. #165, pp. 11-12) is rejected.   The
Court does agree with Safari Club that consolidation of the two
cases does not change the requirement that there must be at least
one plaintiff with standing in each case (Doc. #165, pp. 12-14),
but that requirement is satisfied in these two cases.

### (3)  APA Final Agency Action

Defendants argue that because the 2011 ROD does not authorize

- 43 -

any recreational ORV use, and because such activity cannot occur until the NPS has issued a special rule authorizing it, there has been no "final agency action" which gives the court jurisdiction under the APA as to ORV use.  Defendants further assert that the 2011 ROD is best understood as an interim step, not a final agency action from which legal consequences will flow with respect to ORV use.  In the absence of such a final agency action, Defendants assert that the United States remains immune from judicial review. (Doc. #164, pp. 4-5, 22-23.)

The Eleventh Circuit has held that a ROD is indeed a final agency action.  Defenders of Wildlife v. U.S. Dep't of Navy, 733 F.3d at 1114-15 (holding that both a ROD and a Biological Opinion were final agency actions subject to judicial review).  The Supreme Court also found a NPS policy regulation which did not require anyone to do anything to be a final agency action. National Park Hospitality Ass'n, 538 U.S. at 812.  The 2011 ROD has significant legal consequences and impacts regardless of whether ORV use is actually occurring.  The ROD is needed for the ORV use to occur, and the NPS has begun taking steps in furtherance of the 2011 ROD which impact the ultimate implementation of recreational ORV use.  This is not a case like In re MDL-1824 Tri-State Water Rights Litig., 644 F.3d at 1181-85, where various required written reports (including NEPA requirements) had not even been prepared.  Here, it is clear that a decisionmaking

process has been consummated, and implementation has begun (although it is far from completed).

### (4)  Merits Discussion

The Report and Recommendation concluded that the Addition ORV Plan did not violate the Organic Act or the Establishment Acts. The Report and Recommendation states in pertinent part: "Because the Court has recommended that the administrative record does not reflect that the NPS's decisions were arbitrary and capricious in these areas, the Court recommends that Plaintiffs motion for summary judgment as to Counts Two and Five be denied."  (Doc. #123, p. 76.)

Plaintiffs object that the Report and Recommendation failed to resolve the dispute about the meaning and mandate of the Organic Acts, and simply brushed aside their contentions with little discussion after conflating the procedural NEPA issues with the substantive claims in these counts.  (Doc. #126, pp. 29-32; Doc. #127, pp. 25-30.)  The Federal Defendants respond that Plaintiffs failed to show a violation of the Acts.  (Doc. #130, pp. 35-37.)

The Court sustains Plaintiffs' objection to this portion of the Report and Recommendation.  "The requirements of NEPA are purely procedural and do not mandate any specific outcome; agencies may make a decision that preferences other factors over environmental concerns as long as they have first adequately identified and analyzed the environmental impacts."  <u>Citizens for</u>

Smart Growth, 669 F.3d at 1211. Whether an agency complies with NEPA is a separate and distinct legal issue from whether its decision violates substantive law. Thus, to paraphrase a prior case, it would not necessarily violate NEPA for the NPS to decide to allow recreational ORV use in all portions of the Addition knowing it would cause the permanent, irreversible destruction of the entire Addition. Van Antwerp, 526 F.3d at 1361-62. Such a decision, however, would undoubtedly violate other federal statutes. Therefore, the Court declines to accept this portion of the Report and Recommendation (Doc. #123, p. 76, first full paragraph) and reviews the matter de novo.

Plaintiffs argue that the principal purpose of the Preserve and Addition is conservation, and that recreation, including authorized hunting and ORV use, must always be a secondary consideration. Thus, Plaintiffs assert, all management activities must be directed toward maintaining natural and scientific values, with accommodation of other uses limited to where and when they do not interfere with or disrupt preservation. While Plaintiffs concede that the NPS has some discretion, they assert that under the Organic Act and the Establishment Acts, this discretion must always be exercised in a manner to best protect preservation in the Preserve and Addition. Plaintiffs argue that the Organic Act mandates that preservation predominate when in conflict with recreation, and the Preserve and Addition Establishment Acts

mandate that the NPS manage these areas to assure their natural and ecological integrity in perpetuity.  (Doc. #126, pp. 29-31.)

The PEER Plaintiffs also argue that the Federal Defendants violated these Acts (and some Executive Orders) by significantly deviating from its longstanding management of the Preserve without explanation.  Three such unexplained deviations are asserted: (1) authorization for extensive ORV use in prairies in the Addition, while ORV use in all prairies in the Preserve is prohibited; (2) authorization for several ORV trails that traverse Mullet Slough in the Addition, while ORV use is prohibited in the portion of Mullet Slough in the Preserve; and (3) an expanded definition of "secondary trails" from that applicable to the Preserve.  (Doc. #127, pp. 25-30.)

The overarching legal principles Plaintiffs seek to establish are simply not that easy.  The conservation mandate of the NPS Establishment Act was tweaked by the subsequent Preserve Act and the Addition Act, both of which required multiple use management, which included the allowance of hunting and at least some recreational ORV use.  As was previously stated, multiple use management is "a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put." Defenders of Wildlife, 877 F. Supp. 2d at 1278 (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004)).  The Court rejects Plaintiffs'

argument that every NPS decision must favor preservation if there is a conflict with another goal.  This would not be "striking a balance."  The Court finds that the substantive decisions by the NPS did not violate the Organic Act or the Establishment Acts.

The PEER Plaintiffs also object to unexplained deviations from past practices.  First, Plaintiffs assert that the authorization of extensive ORV use in prairies in the Addition, while ORV use in all prairies in the Preserve is prohibited, violates the Organic Act and the Establishment Acts.  The NPS found that ORV use would have long term, minor, adverse, and localized impact on prairies.  (AR 12979, 13167-68.)  The NPS arrived at these findings by assessing the sustainability of the ORV trails in the Addition and analyzing the impacts of implementing the alternatives set forth in the Addition GMP/EIS.

To develop a sustainable trail system, the NPS mapped the locations of existing roads, trails, and other disturbed areas in the Addition using maps, aerial photographs, and global positioning system equipment.  The "GMP planning team" then conducted field investigations to determine which roads and trails could sustain ORV use.  (AR 12927.)  A "sustainable trail," as defined by the NPS, is "a travel surface that can support currently planned and future uses with minimal impact to the natural systems of the area.  Sustainable trails have negligible soil loss or movement and allow naturally occurring plant communities to

inhabit the area; however, pruning, removal of certain plants, and stabilization over time may be required to accommodate recreational use." (Id.) During field investigations, the "GMP planning team" collected information on vegetation and soil type, trail width, level of use, and the presence of ruts, water, exotic plants, trail improvements, and rare or protected species to aid in the assessment of trail sustainability. (Id.)

The trails in the prairies and marshes of the Addition were easily distinguished on aerial photography due to the visibility of tracks made by ORVs. Because prairies appear to be "the vegetation community most impacted by ORV use" (AR 12979), the ORV trails "would be cited [sic] to avoid prairies and marshes to the greatest extent possible" (AR 13167). Nonetheless, "some adverse impacts on the margins of these plant communities could occur from ORV use." (AR 13167.) Beneficial impacts would also accrue from ORV management and ecosystem restoration projects. (AR 13168.)

The NPS found the trails traversing the prairies in the Addition to be sustainable and determined that the impacts of ORV use would be long term, minor, adverse, and localized. The ORV trail analysis of the Preserve, on the other hand, revealed that "many of the prairie areas were so heavily trafficked that mapping individual trails was impossible." (AR 13720.) While the NPS closed all ORV trails in the Preserve's marl prairies, it did authorize ORV use on a limited segment of trails in other prairies.

(AR 13620, 13761-62.)   Accordingly, the Court finds that the authorization of ORV use in the prairies of the Addition was not an unexplained deviation from past practices.

Second, the PEER Plaintiffs assert that the authorization of several ORV trails traversing Mullet Slough in the Addition, while ORV use is prohibited in the portion of Mullet Slough in the Preserve, violates the Organic Act and the Establishment Acts. This reversal of the NPS's prior position was determined through the same process outlined above.  The NPS conducted on the ground investigations of the primary ORV trails in Mullet Slough and a sustainability analysis was performed.  A portion of the trail in Mullet Slough was an old oil and gas access road that required significant engineering and would require active restoration techniques to return it to its natural condition.  (AR 7159.) "[N]ot only was the trail originally created by machinery, but will continue to be used by machinery, namely ORVs, to access private property in the area."  (AR 7159, 13297.)  Because the NPS investigated the trails in Mullet Slough and determined that they can support currently planned and future ORV use with minimal impact to the natural systems of the area, the Court finds that the NPS's authorization of ORV use does not violate the Organic Act or the Establishment Acts.

Third, plaintiffs assert that the expanded definition of "secondary trails" from that applicable to the Preserve violates

the Organic Act and the Establishment Acts.  As discussed above, this claim is not ripe for judicial review.  Accordingly, the Court concludes that the Federal Defendants' deviation from past practices were adequately explained and do not violate the Organic Act or the Establishment Acts.

## C.   APA Violation Based on Executive Orders Violation

Count Three of Case No. 2:11-cv-578 alleges that the Department of the Interior and the NPS violated the APA because the ORV plan for the Addition lands violated 36 C.F.R. § 4.10 (NPS Rule 4.10), and hence violated the APA requirement that agency action, findings, and conclusions be "in accordance with law."  5 U.S.C. § 706(2)(A).  Specifically, Plaintiffs assert that the ORV plan for the Addition fails to comply with Executive Orders 11,644 and 11,989, as implemented by NPS Rule 4.10.  Plaintiffs assert that the Federal Defendants violated Rule 4.10 by (1) permitting ORV use in areas in the Addition when such use will adversely affect the natural, aesthetic, and scenic values; and (2) by designating ORV trails which do not minimize damage to soil, watershed, vegetation, and other resources of the Addition, do not minimize harassment of wildlife or significant disruption of wildlife habitats, and do not minimize conflicts with other recreational users.  (Doc. #1, ¶¶ 77-85.)  A similar claim is set forth in Count Four of Case No. 2:11-cv-647.

The Court summarized the Executive Orders in <u>Defenders of Wildlife</u>, 877 F. Supp. 2d at 1278-79, which is adopted here. The Court also adopts the discussion of the Executive Orders in the Report and Recommendation. (Doc. #123, pp. 7-9, 76-78.) In sum, Executive Order 11,989 provides that notwithstanding the general provisions relating to the zones of ORV use, the agency head "shall . . . immediately close" any area or route to ORVs whenever he determines that ORV use "will cause or is causing considerable adverse effects" to soil, vegetation, wildlife, wildlife habitat, or cultural or historic resources. Exec. Order 11,989, 42 Fed. Reg. 26959, § 2 (May 24, 1977) (amending Exec. Order 11,644, 37 Fed. Reg. 2877, § 9(a) (Feb. 8, 1972)). The closure must remain in place until the adverse effects have been eliminated and measures have been implemented to prevent future recurrence. <u>Id.</u> at § 2(a). Additionally, each agency head was authorized to "adopt the policy that portions of the public lands within his jurisdiction shall be closed to use by off-road vehicles except those areas or trails which are suitable and specifically designated as open to such use pursuant to Section 3 of this Order." <u>Id.</u> at § 2(b).

**(1)  Ripeness, Standing, and APA Final Agency Action**

Defendants assert that the Executive Order claims are not ripe for judicial review because no trails in the Addition have yet been designated or opened for recreational ORV use and a

special regulation and order is required before recreational ORV use in the Addition would be allowed. Thus, Defendants argue, delaying review would not result in a hardship to Plaintiffs and would allow further development of the issues presented by the Executive Order claims. (Doc. #164, pp. 13-14.)

The Court's discussion of ripeness, standing, and final agency action concerning the Organic Act and Establishment Acts applies equally here. The Court finds that the Executive Order claims are ripe for adjudication, plaintiffs have standing to bring their challenges, and the 2011 ROD is a final agency action as it relates to the Executive Orders.

**(2) Merits Discussion**

The NPCA Plaintiffs assert that the NPS failed to explain how it complied with the minimization of impact requirement of the Executive Orders. (Doc. #126, pp. 31-32.) The PEER Plaintiffs assert the NPS violated the Executive Orders by authorizing a 130 mile primary trail network without complying with minimization criteria required by the Executive Orders. (Doc. #127, pp. 29-30.) The Report and Recommendation found that the NPS conduct was subject to judicial review for compliance with the Executive Orders under the APA standard. (Doc. #123, pp. 76-77.) The Report and Recommendation then appears to reject the Executive Order claim because of its prior finding that there was no NPS decision which was arbitrary and capricious under NEPA. (Doc. #123, p. 78.)

As discussed earlier, NEPA contains procedural requirements, not substantive obligations.  The NEPA determinations are not controlling as to compliance with substantive obligations. Therefore, the Court declines to accept this portion of the Report and Recommendation (Doc. #123, p. 78), and reviews the matter *de novo*.

The Executive Orders require that trails be located to minimize damage to soil, watershed, vegetation, or other resources, and to minimize harassment of wildlife or significant disruption of wildlife habitats.  The Court's *de novo* review of the record establishes that the minimization decisions in the 2011 ROD were not arbitrary or capricious and did not violate the Executive Orders.

As previously discussed, the NPS assessed the sustainability of the existing roads and trails in the Addition and analyzed the impacts of implementing the ORV plan.  (AR 12927, 13160-200.)  To minimize the impacts of ORV use, the NPS developed indicators, standards, and management strategies that are designed to protect resources and enhance visitor experience, including strategies to minimize and manage adverse impacts from motorized use.  (AR 12918-23.)  The NPS also identified "mitigation measures and best management practices that would be applied to avoid or minimize potential impacts from implementation of the action alternatives." (AR 12945-52.)  The NPS has articulated its compliance with the

minimization criteria, and the Court finds that the NPS's actions were not arbitrary or capricious or in violation of the Executive Orders. Accordingly, Defendants are entitled to summary judgment on Count Three of Case No. 2:11-cv-578 and Count Four of Case No. 2:11-cv-647.

## D.   APA Violation Based on NEPA Violation

Count Four in Case No. 2:11-cv-578 alleges that the Department of the Interior and the NPS violated the APA by acting arbitrarily and capriciously and not in accordance with law because they failed to take a "hard look" at the environmental consequences of the actions selected in the 2011 ROD in violation of the National Environmental Policy Act (NEPA). (Doc. #1, ¶¶ 86-90.) Count Five in Case No. 2:11-cv-647 sets forth a similar claim.

The Court adopts the discussion of the legal requirements of NEPA as set forth in the Report and Recommendation. (Doc. #123, pp. 46-48.) In sum, NEPA was designed to infuse environmental considerations into government decision-making. NEPA requires that when a federal agency proposes a "major Federal action[] significantly affecting the quality of the human environment," it must prepare and file an environmental impact statement (EIS) that examines the environmental impacts of the proposed action, compares the action to other alternatives, and discusses means to mitigate any adverse environmental impacts. 42 U.S.C. § 4332(C). When an EIS is required, the federal agency first prepares a draft

EIS and solicits public comments.  The agency must then "assess and consider" the comments in drafting the final EIS, and publish a notice of availability of the final EIS in the Federal Register. When the agency makes its final decision regarding the proposed action and alternatives discussed in the final EIS, the agency prepares a Record of Decision (ROD) identifying the agency's action and the alternatives it considered, stating what the decision was, identifying all alternatives considered by the agency, and stating whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why not.  After issuing the ROD, the agency is then authorized to implement its decision.  See generally Defenders of Wildlife, 733 F.3d at 1109.  NEPA imposes procedural requirements only, and does not mandate any specific outcome.  Citizens for Smart Growth, 669 F.3d at 1211.  A reviewing court asks only whether the agency took a "hard look" at environmental consequences.  Id.

The Report and Recommendation rejected Plaintiffs' challenges and found that the NPS had taken a "hard look" at the impact of ORV use on hydrologic resources, the Florida panther, natural soundscapes, non-motorized visitors, and vegetation communities and sloughs, and that its reliance on the Original Preserve ORV Management Plan was not improper.  (Doc. #123, pp. 48-62.)

**(1) Ripeness**

Defendants assert that the NEPA claims are not ripe for

judicial review.  Defendants argue that the 2011 ROD does not, in and of itself, authorize any recreational ORV use in the Addition, that no such use is occurring, and that no recreational ORV trails have been or can be designated without a special rule.  Until such a rulemaking process is complete, Defendants assert that it is impossible to predict the precise contours of the recreational ORV use in the Addition land.  Therefore, Defendants assert, judicial review is premature under Ohio Forestry.  (Doc. #164, pp. 14-16.)

In Ouachita Watch League v. Jacobs, 463 F.3d 1163 (11th Cir. 2006), the Eleventh Circuit reversed a district court's finding that challenges to changes in certain forest plans were not ripe for judicial review.  The Court summarized the usual ripeness standard, then noted that "NEPA adds an important twist."  Id. at 1174.  The Court stated:

> In a NEPA suit, the issue presented for review typically is whether the agency has complied with the statute's particular procedures.  Because of the rather special nature of the injury (that is, the failure to follow NEPA), the issue is ripe at the time the agency fails to comply.  "Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."  Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 737 (1998).  As we see it, that is the end of the proper ripeness analysis in a NEPA suit.

Id.  Defendants argue the current case is factually distinguishable, but the Court finds no material factual distinctions.  It is the alleged lack of proper procedures which is the focus of the NEPA claims, not the ultimate environmental

outcome.  Plaintiffs' procedural injuries are as ripe as they are going to get, even if no recreational ORV trails are ever used in the Addition.  The Court therefore finds that the NEPA claims are ripe for adjudication.

### (2)  Standing and APA Final Agency Action

For the same reasons discussed relating to the Organic and Establishment Act claims, the Court finds that all Plaintiffs have standing to assert the NEPA challenges and that 2011 ROD is a final agency action for NEPA purposes.  See Defenders of Wildlife, 733 F.3d at 1109.

### (3)  Merits Discussion

Plaintiffs object to the Report and Recommendation's NEPA findings, asserting that due to the lack of funding and other resources, the NPS violated NEPA by issuing the 2011 ROD without obtaining needed studies relating to the Addition's critical hydrology, the endangered Florida panther, natural soundscapes, and vegetative communities.  Plaintiffs also object to the finding that the decision to allow ORV trails through Mullet Slough was not arbitrary.  (Doc. #126, pp. 22-29.)  Plaintiffs further assert that the Report and Recommendation erred in relying on the NPS's adaptive management plan when (1) more scientific information was essential to an informed decision and studies could be performed to provide the needed information; (2) the adaptive management plan is so lacking of specifics in key respects that it is simply

an open-ended grant of discretion to the NPS and not an acceptable substitute for needed studies; (3) the plan failed to adequately consider impacts on the Florida panthers, soundscapes, and non-motorized visitors; and (4) the plan failed to study or evaluate the encircled pockets north of Interstate 75 which would be surrounded on all sides by ORV trails and Interstate 75, creating noise and other human disturbance harmful to the Florida panther and non-motorized visitors.   Plaintiffs also assert that the Report and Recommendation erred in finding that the NPS had adequately considered impacts on hydrology and vegetative communities and sloughs south of Interstate 75.   (Doc. #126, pp. 11-12.)

After a *de novo* review, the Court agrees that the NPS took the required hard look at the impact of ORV use on the hydrologic resources in the Addition.   The Court adopts the Report and Recommendation's discussion of "The impact of ORV use on hydrologic resources" (Doc. #123, pp. 48-50), and Plaintiffs' objections are overruled.   The Court also agrees that the NPS took the required hard look at the impact of ORV use in the Addition on the Florida panther.   The Court adopts the Report and Recommendation's discussion of "The impact of ORV use on the Florida panther" (Doc. #123, pp. 51-54), and Plaintiffs' objections are overruled.   The Court further agrees that the NPS took the required hard look at the impact of ORV use in the Addition on natural soundscapes and

non-motorized visitors.   The Court adopts the Report and Recommendation's discussion of "The impact or ORV use on natural soundscapes and non-motorized visitors" (Doc. #123, pp. 54-57), and Plaintiffs' objections are overruled.   The Court also agrees that the NPS took the required hard look at the impact of ORV use in the Addition on vegetation communities and sloughs.   The Court adopts the Report and Recommendation's "The impact of ORV use on vegetation communities and sloughs" (Doc. #123, pp. 57-60), and Plaintiffs' objections are overruled.   Finally, the Court agrees with, and therefore adopts, the Report and Recommendation's "NPS's reliance on the Original Preserve ORV Management Plan."   (Doc. #123, pp. 60-62.)[21]   Plaintiffs' objections are overruled.

### E.   APA Violation

Count Five in Case No. 2:11-cv-578 alleges that the Department of the Interior and the NPS violated the APA because certain portions of the ORV plan for the Addition land were arbitrary and capricious and an abuse of discretion.   Plaintiffs assert that the Addition ORV plan was arbitrary and capricious for the reasons set forth in the NEPA claim, for allowing recreational ORV use in the Addition at all, and for allowing recreational ORV use in inappropriate areas of the Addition.   (Doc. #1, ¶¶ 91-93.)   A similar claim is set forth in Count Six in Case No. 2:11-cv-647.

---

[21]The Court would note that the reference to "A.R. 12396" should be "A.R. 12936."

This appears to be a "freestanding" APA claim.  The legal principles governing the APA and the underlying statutes have been discussed previously.

**(1)  Ripeness, Standing, and APA Final Agency Action**

Defendants assert that the freestanding APA claims are not ripe for judicial review (Doc. #164, p. 17), plaintiffs lack standing (Doc. #164, pp. 19-21), and the 2011 ROD is not a final agency action (Doc. #164, p. 22.)  For the reasons discussed earlier, the Court rejects each of these arguments as they relate to this APA claim.

**(2)  Merits Discussion**

The Report and Recommendation states in pertinent part: "Because the Court has recommended that the administrative record does not reflect that the NPS's decisions were arbitrary and capricious in these areas, the Court recommends that Plaintiffs motion for summary judgment as to Counts Two and Five be denied." (Doc. #123, p. 76.)  Plaintiffs object that the Report and Recommendation conflated the procedural NEPA issues with the substantive claims in these counts.  (Doc. #126, pp. 29-32; Doc. #127, pp. 25-30.)  The Court sustains Plaintiffs' objection for the reasons stated earlier.  As discussed with regard to Count Two, whether an agency complies with NEPA is a separate and distinct legal issue from whether its decision violates substantive law.  Therefore, the Court declines to accept this

portion of the Report and Recommendation (Doc. #123, p. 76, first full paragraph), and reviews the matter *de novo*.

Plaintiffs assert that the Addition ORV plan was arbitrary and capricious because the NPS failed to comply with the NEPA requirements.  As the Court has found, the Federal Defendants did not fail to comply with the NEPA requirements, and therefore Plaintiffs' APA claims are without merit as to this basis.

Plaintiffs also assert that the Addition ORV plan was arbitrary and capricious for allowing recreational ORV use in the Addition at all.  As the Court stated in connection with its discussion of the Organic Act and the Establishment Acts, both the Preserve and the Addition were intended to have ORV use, albeit with restrictions.  Barring all ORV use is the Addition would violate these Acts, and therefore failure to bar ORV use in the Addition was not a violation of the APA.

Plaintiffs further assert that the Addition ORV plan was arbitrary and capricious for allowing recreational ORV use in inappropriate areas of the Addition.  As previously discussed, the NPS assessed the sustainability of the ORV trails and impact of ORV use in the Addition and has articulated its compliance with the minimization criteria.  Accordingly, the Court finds Plaintiffs' argument to be without merit.

**F.   Endangered Species Act and APA, Biological Opinion**

Count Six in Case No. 2:11-cv-578 alleges that the U.S. Fish and Wildlife Service (FWS), the Department of the Interior, and the NPS violated the Endangered Species Act (ESA) and the APA by obtaining an arbitrary and capricious Biological Opinion from the FWS and violating various independent duties under the ESA.  (Doc. #1, ¶¶ 94-103.)  A similar claim is set forth in Count Two in Case No. 2:11-cv-647.

The Court adopts the legal discussion of the ESA as set forth in the Report and Recommendation (Doc. #123, pp. 63-64), and in Defenders of Wildlife, 877 F. Supp. 2d at 1277, 1304-07.  In sum, Congress enacted the ESA to ensure "that all Federal departments and agencies . . . seek to conserve endangered species and threatened species."  16 U.S.C. § 1531(c)(1).  The ESA provides for the listing of species as threatened or endangered and the designation of their critical habitat.  As relevant here, the Secretary of the Interior administers the ESA through the FWS.

Under certain circumstances, the ESA requires that a federal agency consult with the appropriate expert agency.  In determining whether formal consultation with the FWS is necessary, the federal agency first prepares a biological assessment which evaluates the potential effects of its proposed action on listed and proposed species and designated and proposed critical habitat and determines whether the species or habitat are likely to be

adversely affected by the action.  50 C.F.R. § 402.12(a).  If the biological assessment determines that an action "may affect" a listed species or critical habitat, formal consultation is required.

If formal consultation is necessary, the FWS is then responsible for formulating a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).  The biological opinion must include a "detailed discussion of the effects of the action on listed species or critical habitat" in addition to the expert agency's ultimate opinion on jeopardy.  50 C.F.R. § 402.14(h)(2).  In preparing the biological opinion, the FWS is to use "the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).  If the FWS concludes the action is likely to jeopardize the continued existence of listed species, it must suggest "reasonable and prudent alternatives" which can be taken by the federal agency to ensure that its action does not jeopardize the continued existence of the species.  16 U.S.C. § 1536(b)(3)(A).

The ESA prohibits the "taking" of any member of a listed endangered or threatened species.  "Take" is defined broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture,

or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The ESA also directs federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy critical habitat. 16 U.S.C. § 1536(a)(2).

When a federal agency has been advised that the proposed action will not jeopardize the continued existence of listed species but will result in the taking of some species incidental to that action, the FWS's biological opinion must include an incidental take statement specifying the amount or extent of anticipated take. The incidental take statement must discuss reasonable and prudent measures necessary or appropriate to minimize the impact of the incidental take. Any take in compliance with the terms and conditions of an incidental take statement is lawful. If the FWS decides that no take is likely from the implementation of a proposed federal action, no incidental take statement is required in the biological opinion. See generally Defenders of Wildlife, 733 F.3d at 1111-13.

**(1)  Ripeness, Standing, and APA Final Agency Action**

Defendants concede that a Biological Opinion is a final agency action which is the subject of judicial review. (Doc. #164, p. 17.) Defendants nonetheless argue that this claim is not ripe for judicial review because the NPS has not yet taken any actions in

reliance on the Biological Opinion that have injured Plaintiffs' interests.  Defendants argue that the NPS has yet to authorize recreational ORV use, designate secondary trails, or authorize hunting in the Addition land, and this claim will not ripen until the NPS authorizes recreational ORV use, designates secondary trails, and implements a hunting management plan.  Defendants also assert that Plaintiffs lack standing to bring this challenge. (Doc. #164, pp. 18-19.)

The Court disagrees with Defendants' arguments to the extent they relate to primary ORV trails.  Nothing need occur which will make Plaintiffs' challenge to the Biological Opinion more ripe than it is now as to primary ORV trails.  The issues are fit for judicial review and there would be a hardship to Plaintiffs if judicial review were withheld.  The Biological Opinion represents the culmination of the FWS's decisionmaking process, and the FWS's role "is terminated with the issuance of the biological opinion." 50 C.F.R. § 402.14(l).  A Biological Opinion alters the legal landscape by allowing persons to comply with it and avoid ESA sanctions.  Bennett, 520 U.S. at 169-70.  Therefore, the Biological Opinion is both ripe and a final agency action as to the primary ORV trails.  All Plaintiffs have standing to challenge the Biological Opinion for the same reasons previously discussed relating to the APA and the other substantive statutes.

Defendants' motion is well founded to the extent that Plaintiffs challenge secondary trails or hunting in the Addition. The record is clear that it is only primary trails which are at issue in the various decisions by the NPS or FWS, and the agencies agree that NEPA analysis will be needed if and when secondary trails and a hunting plan are at issue. Challenges to secondary trails and hunting are not ripe and there has been no final agency action.

**(2)  Merits Discussion**

Plaintiffs object that the agency did not consider the encircled pocket aspect of the ORV trails effect on the panther, which needed another level of analysis. (Docs. #126, p. 32; Doc. #127, pp. 22-24.)  The Court adopts the discussion in the Report and Recommendation (Doc. #123, pp. 29-30, 64-72), and after *de novo* review, overrules the objections.

Plaintiffs also object to the Report and Recommendation's conclusion that "[t]here is no indication in the record that FWS was arbitrary or capricious in foregoing the formal consultation process in light of its determination, in consultation with NPS, that the GMP/EIS was not likely to adversely affect the Eastern Indigo snake." (Doc. #127, pp. 18-21.)  Specifically, Plaintiffs argue that the FWS acted in contravention of the ESA by failing to give "the benefit of the doubt" to the Eastern Indigo snake.  "The need to give a species the benefit of the doubt," however, "cannot

stand alone as a challenge to a biological opinion." <u>Miccosukee</u> <u>Tribe of Indians of Fla.</u>, 566 F.3d at 1268.   Here, the administrative record reflects that the NPS and the FWS engaged in informal consultation regarding the Eastern Indigo snake and considered the cumulative impact of the preferred alternative in reaching its ultimate conclusion.   Although the decision may have been "close", the Court must be at its most deferential when reviewing an agency's area of expertise.   Because the record supports the FWS's decision, the Court cannot say that it acted arbitrarily or capriciously or in violation of the law. Accordingly, the Court, after *de novo* review, overrules the objections and adopts the discussion in the Report and Recommendation.   (Doc. #123, pp. 65-68.)

**G.   Endangered Species Act and APA, Incidental Take Statement**

Count Seven in Case No. 2:11-cv-578 alleges that the FWS, the Department of the Interior, and the NPS violated the ESA and the APA by obtaining an arbitrary and capricious incidental take statement from the FWS.   There is no corresponding count in Case No. 2:11-cv-647.

The Court has summarized the applicable law in Section III.F. of this Opinion and Order.   The Report and Recommendation found no violation of the ESA or the APA based upon the incidental take statement.

**(1)   Ripeness, Standing, APA Final Agency Action**

The Court adopts its findings and conclusions as stated in connection with the ESA Biological Opinion claims.   The Court finds the incidental take statement claims as to the primary trails to be ripe, all plaintiffs to have standing, and the Incidental Take Statement to be a final agency action.

**(2)   Merits Discussion**

Plaintiffs filed objections.   (Doc. #127, p. 24.)   The Court adopts the discussion in the Report and Recommendation (Doc. #123, pp. 30-31, 72-75), and after *de novo* review, overrules the objections.

Accordingly, it is hereby

**ORDERED:**

1.   The Report and Recommendation (Doc. #123) is **ACCEPTED AND ADOPTED IN PART AND REJECTED IN PART**.   The Court rejects or amends the following portions of the Report and Recommendation: (a) the word "Plaintiffs" at page 39, line 3 is changed to "Defendants"; (b) the record citation on page 40 footnote 25 is changed to "A.R. 14,202" instead of "AR 14,602"; (c) the discussion of the interpretation of the phrase "imprint of man's work substantially unnoticed" and the magistrate judge's decision to not pass judgment on the NPS's Wilderness Act determination (Doc. #123, pp. 42-45) is rejected, and the Court substitutes the discussion and findings at pages 26-34 of this Opinion and Order;

(d) the first full paragraph on page 76 is rejected, and the Court substitutes the discussions and findings at pages 46-51 and 62-63 of this Opinion and Order; and (e) the conclusion of the Executive Order claim (Doc. #123, p. 78) is rejected, and the Court substitutes the discussion and findings at pages 54-55 of this Opinion and Order.   The Report and Recommendation is otherwise adopted.

2.   Plaintiffs' Joint Motion for Summary Judgment (Doc. #103) is **DENIED.**

3.   Federal Defendants' Cross Motion for Summary Judgment (Doc. #106) is **GRANTED** to the extent that judgment shall enter as set forth below.

4.   Defendant-Intervenor Safari Club International's Motion for Summary Judgment (Doc. #108) is **GRANTED** to the extent that judgment shall enter as set forth below.

5.   Defendant-Intervenor Florida Wildlife Federation's Cross-Motion for Summary Judgment (Doc. #110) is **GRANTED** to the extent that judgment shall enter as set forth below.

6.   Defendant-Intervenor Florida Fish and Wildlife Conservation Commission's Motion for Summary Judgment (Doc. #111) is **GRANTED** to the extent that judgment shall enter as set forth below.

7.   Federal Defendants' Motion to Dismiss for Lack of Jurisdiction (Doc. #164) is **GRANTED IN PART AND DENIED IN PART.**

The portion of Count Two in each case challenging the general adoptive management of the ORV Plan and challenging secondary trails, and the portion of Count Six in Case No. 2:11-cv-578-FtM-29CM challenging the secondary trails and hunting in the Addition are **DISMISSED WITHOUT PREJUDICE AS NOT RIPE FOR JUDICIAL REVIEW.** The motion is otherwise denied.

8.   Defendant-Intervenor Safari Club International's Motion to Dismiss on Jurisdictional Grounds (Doc. #165) is **GRANTED IN PART AND DENIED IN PART.**  The portion of Count Two in each case challenging the general adoptive management of the ORV Plan and challenging secondary trails, and the portion of Count Six in Case No. 2:11-cv-578-FtM-29CM challenging the secondary trails and hunting in the Addition are **DISMISSED WITHOUT PREJUDICE AS NOT RIPE FOR JUDICIAL REVIEW.**  The motion is otherwise denied.

9.   Federal Defendants' Motion to Strike Peer Plaintiffs' "Notice of Filing" (Doc. #175) is **DENIED.**

10.  As to the Complaint (Doc. #1) in Case No. 2:11-cv-578-FtM-29CM, judgment shall be entered as follows:

    a.   Count One:  In favor of Defendants and against Plaintiffs, who shall take nothing;

    b.   Count Two: The portions challenging the general adoptive management of the ORV Plan and challenging secondary trails are dismissed without prejudice as being unripe for judicial review.  Judgment on the remainder of the

Count is in favor of Defendants and against Plaintiffs, who shall take nothing;

c.   Count Three: In favor of Defendants and against Plaintiffs, who shall take nothing;

d.   Count Four: In favor of Defendants and against Plaintiffs, who shall take nothing;

e.   Count Five: In favor of Defendants and against Plaintiffs, who shall take nothing;

f.   Count Six: The portions challenging the secondary trails and hunting in the Addition are dismissed without prejudice as being unripe for judicial review.  Judgment on the remainder of the Count is in favor of Defendants and against Plaintiffs, who shall take nothing;

g.   Count Seven: In favor of Defendants and against Plaintiffs, who shall take nothing;

h.   Count Eight: Dismissed pursuant to the Opinion and Order (Doc. #105) dated August 20, 2012.

11.   As to the Complaint (Doc. #1) in Case No. 2:11-cv-647-FtM-29CM, judgment shall be entered as follows:

a.   Count One: In favor of Defendants and against Plaintiffs, who shall take nothing;

b.   Count Two: The portions challenging the secondary trails and hunting in the Addition are dismissed without prejudice as being unripe for judicial review.  Judgment

on the remainder of the Count is in favor of Defendants and against Plaintiffs, who shall take nothing;

c.   Count Three: The portions challenging the secondary trails and hunting in the Addition are dismissed without prejudice as being unripe for judicial review.  Judgment on the remainder of the Count is in favor of Defendants and against Plaintiffs, who shall take nothing;

d.   Count Four: In favor of Defendants and against Plaintiffs, who shall take nothing;

e.   Count Five: In favor of Defendants and against Plaintiffs, who shall take nothing;

f.   Count Six: In favor of Defendants and against Plaintiffs, who shall take nothing;

12. The Clerk shall enter judgment accordingly, terminate all pending motions and deadlines as moot, and close the file.

**DONE and ORDERED** at Fort Myers, Florida, this   19th   day of September, 2014.

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

Copies:

Counsel of Record